STATE OF NORTH CAROLINA v. WARREN S. BRONSON

No. 123A92

(Filed 18 December 1992)

1. **Criminal Law § 838 (NCI4th) — murder — defense expert — clinical psychologist — instructions**

The trial court did not err in a murder prosecution in its instruction regarding defendant's expert clinical psychologist where defendant did not object to the instructions and the assignment of error was considered under the plain error rule. The jury heard testimony outlining the witness's academic credentials and work experience, heard the trial judge accept the witness in the field of clinical psychology, the witness was able to provide the jury with the factual basis and reasoning for his opinion, and the judge's instructions to the jury clearly provided that the witness was an expert who could present opinions in the field of clinical psychology that a lay witness could not present. The jurors would have reached the same result had they been told that they could consider

the witness's training, qualifications and experience in addition to the usual considerations of credibility.

**Am Jur 2d, Trial §§ 1405 et seq.**

2. **Evidence and Witnesses § 2641 (NCI4th) — murder — cross-examination of defendant — communications with attorney — no objection — privilege waived**

A defendant in a murder prosecution waived the attorney-client privilege when he did not object and voluntarily answered the prosecutor's questions regarding his communications with his attorney.

**Am Jur 2d, Witnesses §§ 350-352.**

**Party's waiver of privilege as to communications with counsel by taking stand and testifying. 51 ALR2d 521.**

3. **Evidence and Witnesses § 3157 (NCI4th) — murder — expert witness — opinion on defendant's credibility — no plain error**

There was no plain error in a murder prosecution in permitting defendant's clinical psychologist to express an opinion on defendant's credibility where defendant did not object to the form of the questions or to the answers given by the psychologist. Assuming that these questions were improper and that the responses were subject to more than one interpretation, given the evidence the jury would not have reached a different verdict absent this testimony.

**Am Jur 2d, Expert and Opinion Evidence § 191.**

**Necessity and admissibility of expert testimony as to credibility of witness. 20 ALR3d 684.**

4. **Evidence and Witnesses § 2049 (NCI4th) — murder — testimony of neighbor — victim belittling defendant**

There was no plain error in a murder prosecution in allowing a witness to testify that defendant's wife constantly complained and belittled him where the State's question (whether the witness knew of anything the victim had done or anything about the victim that would justify the shooting) was asked in an attempt to ascertain if the witness had any factual basis

STATE v. BRONSON

[333 N.C. 67 (1992)]

for an implication that the victim may have provoked the shooting and not to have the witness render a legal conclusion.

**Am Jur 2d, Expert and Opinion Evidence § 27; Witnesses § 747.**

5. **Evidence and Witnesses § 2873 (NCI4th)— murder—cross-examination—last rites for victim—no error**

There was no reversible error and no abuse of discretion in a murder prosecution where the prosecutor asked defendant's priest on cross-examination whether the last rites sometimes produced a sense of peacefulness and whether people killed in their sleep, as was this victim, were denied that chance.

**Am Jur 2d, Trial § 500; Witnesses § 831.**

6. **Evidence and Witnesses § 672 (NCI4th)— murder—hearsay—identical evidence admitted without objection—waiver**

There was no plain error in a murder prosecution where the trial court allowed inadmissible hearsay from two witnesses but defendant waived any possible objection by eliciting virtually identical testimony.

**Am Jur 2d, Evidence §§ 494, 1103.**

7. **Constitutional Law § 374 (NCI4th)— first degree murder—mandatory life sentence—not cruel and unusual**

The mandatory imposition of a life sentence for a first degree murder, tried noncapitally, was not cruel and unusual punishment and neither a proportionality review nor a sentencing hearing following the same guidelines provided for other felonies was required.

**Am Jur 2d, Criminal Law §§ 527, 626, 627.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Stevens (Henry L., III), J., at the 15 July 1991 Criminal Session of Superior Court, Pender County. Heard in the Supreme Court 8 October 1992.

*Lacy H. Thornburg, Attorney General, by Thomas F. Moffitt, Special Deputy Attorney General, for the State.*

*Nora Henry Hargrove for defendant.*

STATE v. BRONSON

[333 N.C. 67 (1992)]

FRYE, Justice.

On 10 September 1990, defendant, Warren S. Bronson, was indicted by a Pender County grand jury for the 2 August 1990 first-degree murder of his wife, Sherry Bronson. Defendant pled not guilty and was tried noncapitally. The jury found defendant guilty, and the trial judge imposed the mandatory sentence of life imprisonment. Defendant filed written notice of appeal to this Court on 29 July 1991.

Defendant brings forward seven assignments of error. After a thorough review of the record, we conclude that defendant received a fair trial free of prejudicial error.

The State presented evidence tending to show the following facts and circumstances. On 2 August 1990, at approximately 5:00 a.m., Pender County Deputy Sheriff Edwin Simpson received an emergency telephone call from defendant. Defendant told Simpson that an intruder had broken into his home and shot him and his wife. Defendant allegedly fired two shots at the intruder as the intruder fled defendant's home.

Deputy Sheriff Charles M. Marshall responded to defendant's call. When Marshall arrived at defendant's home, he walked around both sides of the house to make sure no one was there. Heavy dew was on the ground, but Marshall found no disturbance to the dew or evidence of a trail leading from the house made by an escaping intruder. When Marshall entered defendant's home, he found defendant sitting in the middle of the living room floor holding his twenty-one-month-old son. Defendant's left leg was bleeding from a gunshot wound. Defendant told Marshall that an intruder shot his wife with a shotgun and then shot him when he struggled with the intruder. Defendant also told Marshall that he wrestled with the intruder and gained control of the shotgun as he fell wounded to the kitchen floor.

There were numerous boxes in the house because defendant and his family were in the process of moving from their Jacksonville home to a house located in Pender County. However, none of the boxes were knocked over, scattered, or disturbed. Marshall found Sherry Bronson, defendant's wife, lying on her right side between a bed and dresser in the master bedroom. She had been shot twice in the chest and was dead. A pump-action shotgun, an empty shotgun shell, and an open box of shells were lying on the floor nearby.

STATE v. BRONSON

[333 N.C. 67 (1992)]

Once additional police officers and medical personnel arrived, defendant was taken to Pender Memorial Hospital where he received pain medication and was transported to the Naval Hospital at Camp Lejeune for surgery. After searching the house and the surrounding area, officers were unable to find any evidence of forced entry on the windows or doors. There were no footprints in the heavy dew around the outside of the house, and search dogs were unable to pick up the scent of the alleged intruder.

The police found two shotgun blast holes inside the house. There was one hole in the back door and a second in a wall near the door jamb of the back door. The holes were approximately four feet above the floor and angled slightly downward from the inside to the outside of the house. This evidence tended to contradict defendant's later story that he fired at the intruder while defendant was lying on the floor.

State Bureau of Investigation Agent Bruce Kennedy interviewed defendant at the Naval Hospital. During the interview, defendant related the following events. He awakened at 4:45 a.m. and let his dogs out of the house. His wife was asleep, and their son was asleep in a separate bedroom. As defendant left the bathroom, he saw a man standing at the foot of his wife's bed. The man shot defendant's wife with a shotgun, turned, and pointed it toward defendant's chest. Defendant grabbed the muzzle of the shotgun and it fired, hitting him in the leg. Defendant then fell backward onto the kitchen floor, he wrestled the shotgun from the intruder, and as the intruder ran out of the back door, defendant fired two shots at him while lying on the floor.

During defendant's interview with Kennedy, Detective Dick Wright of the Pender County Sheriff's Department arrived, and defendant continued to tell his version of what had happened. Kennedy and Wright pointed out the discrepancies in defendant's story, and told defendant that the physical evidence failed to corroborate his version of the events.

Defendant then admitted that there had not been an intruder in the house. According to defendant, after an argument, his wife threatened to leave him and to take his son. She tried to return her wedding ring and then pulled the shotgun and pointed it at his chest. He grabbed the shotgun barrel, and during a struggle he was shot in the leg. Defendant stated that after being shot he lost control of his emotions, took the shotgun from his wife,

and shot her. Once defendant provided this information to the officers, Kennedy stopped the interview and conferred with other police officers at the scene.

After Kennedy's conference with the other officers, he read defendant his *Miranda* rights and the interview continued. Defendant then told the officers that after he awakened on the morning of the shooting, he asked his wife to drive him to work at Camp Lejeune. She refused and told him not to expect her or their son to be home when he returned from work. According to defendant, his wife got the shotgun and loaded it when he left the room to let the dogs outside. When he returned, she shot him while he was in the kitchen, he lost control and shot her after she ran back to her bed. However, before he shot his wife, she mocked him by telling him that he had no guts. Defendant fired shots into the door after shooting his wife, then called police with the intruder story.

After this version of the events, Kennedy told defendant that the police would perform a gunshot residue test on his wife's hands to find out whether she fired the shotgun. Defendant then changed his story and admitted that his wife had not fired the shotgun and that he had shot himself. Defendant explained that he and his wife had been arguing the previous night, and he had awakened at approximately 3:00 a.m., roamed around the house, and then let the dogs outside. Defendant told the officers that he was tired of his wife "hurting." He then stated that he took his shotgun out of its case and loaded it at approximately 4:30 a.m., while he was in the kitchen, but he had thought about killing his wife before he loaded the shotgun. At approximately 5:00 a.m., he shot her while she slept in her bed. Defendant then walked into the kitchen, shot himself in the leg, and shot the back door.

On 7 August 1990, defendant recounted yet another version of the shooting to Detective Wright. Defendant told Wright that the night before the shooting he returned home from work at about 5:30 p.m., and a friend came to his house. According to defendant, his family and the friend went to Jacksonville to have dinner and to get some videotaped movies. After returning home, his friend left and defendant and his wife began to argue. At midnight, defendant and his wife went to bed. Defendant awoke at approximately 3:00 a.m. and roamed the house until 4:45 a.m. He let the dogs outside, loaded the shotgun, walked into the bedroom,

**STATE v. BRONSON**

[333 N.C. 67 (1992)]

told his wife he loved her, and shot her. Defendant then walked into the kitchen, pointed the shotgun at his chest and considered killing himself, but lost his nerve and shot himself in the leg. Defendant told Wright that he fired two shots at the door because he was mad at himself for not having the courage to kill himself.

During his trial, defendant testified in his own defense. Defendant described how his military career progressed until he met and married his wife. Defendant told the jury that financial problems developed which led to borrowing money from his parents and the deterioration of his marriage. He described how he and his wife argued about their finances and his work schedule. He also described how his wife's physical problems with allergies exacerbated their other problems. Defendant testified that his wife interfered with his military career by repeatedly calling his superiors and demanding that he be allowed to leave work early to take care of her. In April or May 1990, the couple sought marriage counseling, but stopped after only four visits. Defendant testified that his wife had threatened to leave him, take their son, move into a home for unwed mothers, and leave defendant to take care of their mounting bills.

Defendant then proceeded to provide the jury with a fifth version of what occurred on the night his wife was shot. Defendant testified that he and his wife had gone to dinner with a friend and, after returning home, they began to argue about furniture that had to be returned to the store and other financial matters. Defendant's wife tried to return her wedding ring, then the couple went to bed around midnight. Defendant awoke at 3:00 a.m. and let the dogs outside. At 5:00 a.m., he looked at his wife as she lay sleeping in their bed, told her that he loved her, and then shot her. Defendant testified that the shotgun was already loaded because he had loaded it weeks before after a break-in at their Jacksonville apartment shortly before moving to Pender County. Defendant also testified that, after the break-in, he kept the loaded shotgun near his bed.

After shooting his wife, defendant tried to kill himself but the shotgun malfunctioned and failed to fire. However, when he lowered the shotgun, it fired and hit him in the leg. Defendant became angry and fired the remaining two rounds at the back door to empty the shotgun so that no one else could be hurt. When he called the police dispatcher on the morning of the shooting,

he actually believed that an intruder had shot his wife. He stated that on the morning of the shooting, he was not in control of his ability to reason, his mental faculties were impaired, and he was not able to make and carry out plans. Defendant admitted killing his wife, but denied that he planned to kill her.

Defendant presented the expert testimony of Henry Tonn, a clinical psychologist. Mr. Tonn testified that the tests that he gave defendant indicated that defendant took the tests honestly and that under sufficient amounts of stress he could develop some emotional problems. Mr. Tonn was of the opinion that the constant concerns about defendant's career, his marriage and possible break-up, including the loss of custody of his son, put severe stress upon him. In Mr. Tonn's opinion, defendant was suffering from "mental disassociation" during the hours leading to the killing of his wife, which meant defendant felt as if there was a separation between how he felt and what he was doing, almost like he was observing himself carrying out behavior. According to Mr. Tonn, defendant's emotional disturbance and mental condition substantially interfered with his mental faculties and his ability to reason. Mr. Tonn found defendant to be very intelligent and concluded that the fact that defendant gave differing versions of what happened on the morning of the shooting indicated that he was not thinking with a clear mind.

Additional facts will be discussed as they become relevant to a fuller understanding of the specific issues raised on appeal.

[1] In defendant's first assignment of error, he contends that the trial court committed plain error by failing to adequately instruct the jury regarding defendant's expert witness. Defendant contends that "[t]he trial court so truncated the pattern jury instructions on the consideration of expert testimony as to deprive the defendant of his right to present a defense." Defendant argues that Mr. Tonn's testimony made sense of all of the evidence, e.g., the position of Sherry Bronson's arms, indicating that she may well have been awake and arguing, and the varying statements made by defendant.

At the conclusion of all the evidence, the jury was instructed regarding the testimony of an expert witness as follows:

> Now in holding Henry Tonn to be an expert in the field of clinical psychology, the Court does not mean by this that you are bound by his testimony. That is, you will treat him just as you would any other witness in determining whether or

STATE v. BRONSON

[333 N.C. 67 (1992)]

not his testimony is acceptable to you. However, in this particular field, the witness is, in law, permitted to express an opinion that he would not otherwise be permitted to express were he not held to be an expert in the area of, in this case, clinical psychology.

Defendant contends that the party offering expert testimony is entitled to have the jury instructed on the use of the expert testimony. *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988). Defendant further contends that it is error for the court to either undercut or overemphasize that testimony. *Galloway v. Lawrence*, 266 N.C. 245, 145 S.E.2d 861 (1966). Therefore, defendant argues that "[t]he instructions given in the present case fails (sic) to instruct the [jurors] that in determining the testimony of an expert witness, aside from the usual considerations of the witness's credibility, they can consider the witness's training, qualifications and experience."

Defendant did not object to the instructions, therefore this assignment of error must be considered under the plain error rule. *State v. Jeune*, 332 N.C. 424, 436, 420 S.E.2d 406, 413 (1992). Under the plain error rule, a new trial will be granted for an error to which no objection was made at trial only if a defendant meets a heavy burden of convincing the Court that, absent the error, the jury probably would have returned a different verdict. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983).

In the present case, the jury heard testimony outlining Mr. Tonn's academic credentials and work experience. The jury also heard the trial judge accept Mr. Tonn as an expert witness in the field of clinical psychology. In addition, Mr. Tonn was allowed to provide the jury with the factual basis and reasoning for his expert opinion that defendant was under so much stress on the morning of the murder that he was not in control of his mental and emotional faculties. The judge's instructions to the jury clearly provided that Mr. Tonn was an expert witness who could, as a matter of law, present opinions in the field of clinical psychology that a lay witness could not present.

We are convinced that had the jurors been told that they could consider Mr. Tonn's training, qualifications and experience, in addition to the usual considerations of a witness' credibility, the jury would have reached the same result in this case. Thus,

STATE v. BRONSON

[333 N.C. 67 (1992)]

defendant cannot show error under the plain error rule. This assignment of error is without merit.

[2] Defendant next contends that the prosecutor's questions regarding his communications with his attorney were misleading, prejudicial, and exceeded the scope of proper cross-examination. Defendant testified that his trial testimony was the correct version of the events. However, the prosecutor attempted to show that defendant's versions of the crime given shortly after the murder differed in significant detail from the version he presented to the jury which challenged the State's contention that defendant killed his wife after premeditation and deliberation. The prosecutor asked defendant if he had discussed the concepts of premeditation and deliberation with his attorney before trial. Without objection, defendant testified that he had discussed premeditation and deliberation with his attorney. Defendant also testified that he had known what premeditation and deliberation meant prior to discussing the same with his attorney because he had worked briefly with the military police.

Defendant concedes that the prosecutor had the right to impeach him with questions about the different versions of the events and about whether he knew the meaning of premeditation and deliberation. But, defendant argues that it was improper to ask such questions in the context of his conferences with his attorney.

It is well settled that communications between an attorney and a client are privileged under proper circumstances. *State v. Taylor*, 327 N.C. 147, 393 S.E.2d 801 (1990). The attorney-client privilege belongs to the defendant and may be waived by him. *Id.* at 152, 393 S.E.2d at 805. In the instant case, defendant failed to object to the questions and did not raise the attorney-client privilege, but voluntarily answered all of the prosecutor's questions. Therefore, defendant waived the attorney-client privilege. We reject this assignment of error.

[3] In his third assignment of error, defendant contends that certain questions asked of defendant's expert witness permitted Mr. Tonn to express an opinion on defendant's credibility which invaded the fact-finding province of the jury. Mr. Tonn, an expert in clinical psychology, testified that he administered several psychological tests to defendant, and one of the tests, the Minnesota Multiphasic Personality Inventory (MMPI), had a "lie scale" that indicates to a trained psychologist whether the test taker truthfully answered

STATE v. BRONSON

[333 N.C. 67 (1992)]

the test questions and that "the MMPI indicated that he [defendant] took it honestly and didn't show that he had any psychological flaws in his personality."

During cross-examination, the prosecutor asked Mr. Tonn the following questions:

> Q. Are you familiar with what we refer to as the fourth story, that is the story that he [defendant] finally, the last story that he told Mr. Kennedy in the emergency room?
>
> A. Yes, I am.
>
> Q. And in your opinion was that truly what happened?
>
> A. That would be my opinion, yes.
>
> Q. All right, sir. That's all.

Defendant did not object to the form of the questions and did not object to the answers given by the psychologist. Nevertheless, defendant now contends that the expert witness was asked to decide which of the various statements made by defendant was in fact true, a question of credibility solely for the jury.

The State contends that the questions were related to the underlying data which served as the facts or basis of the expert's opinion and the expert's responses were not an opinion on defendant's credibility. *See* N.C.G.S. § 8C-1, Rule 705 (1992).

Assuming, *arguendo*, that these questions were improper and that the responses were subject to more than one interpretation, we are convinced that absent this testimony the jury would not have reached a different verdict, given the other evidence in this case. Thus, defendant is not entitled to a new trial under the plain error rule. *See State v. Mitchell*, 328 N.C. 705, 711, 403 S.E.2d 287, 290 (1991) (before granting a new trial under the plain error rule, the appellate court must be convinced that, absent the alleged error, a jury probably would have reached a different verdict).

[4] In defendant's next assignment of error, he contends that the trial court committed plain error when it allowed a witness to impermissibly testify to a legal conclusion. Dorothy Richardson, defendant's neighbor, testified that defendant's wife constantly complained and belittled him. During cross-examination, the prosecutor asked the witness:

STATE v. BRONSON

[333 N.C. 67 (1992)]

Q. Do you know of anything that Sherry Bronson ever did or anything about Sherry Bronson that would justify her husband shooting her twice in the heart with a shotgun at close range?

A. Well, all I know is she said she was going to take the baby and that can be a breaking point for some people.

Q. Question, do you know of anything she ever did or anything about her character that would justify her husband shooting her twice in the heart with a shotgun at close range? Yes or no?

A. When a person belittles . . .

THE COURT: No ma'am, listen.

A. No.

THE COURT: Answer the question if you can. You may explain your answer if you desire to do so.

A. No, I don't know a reason why but I do know that when a person cuts a person low continuously for so long and then threatens to take the very thing they hold dearest to them, you just, you can just reach a breaking point. It happens.

The State contends that the question was asked by the prosecutor in an attempt to ascertain if the witness had any factual basis for the implication that the victim may have provoked the shooting. The question was not asked to have the witness render a legal conclusion. We agree. The witness' response indicated that her testimony was based on an impression of the defendant's relationship with his wife, and not based on any specific instances of provocative conduct by Sherry Bronson.

In addition, there was no objection at trial to the challenged questioning, therefore any error must be reviewed under the plain error rule. N.C. R. App. P. 10(b). Defendant cannot meet the burden of proving that the cross-examination of Ms. Richardson resulted in an error so grave as to cause the jury to reach a decision it would not have reached if the testimony had been excluded. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375. Thus, defendant's fourth assignment of error is rejected.

[5] In defendant's fifth assignment of error, he contends that the prosecutor's questions regarding last rites were highly improper, inflammatory, irrelevant and unfairly prejudicial to him. Defend-

STATE v. BRONSON

[333 N.C. 67 (1992)]

ant's priest, Father John Mott, testified that defendant told him that he was under great stress, that he planned to kill his wife and himself, but lost his nerve after he shot her and could not take his own life. During cross-examination, Father Mott was asked the following:

Q. And Father Mott, have you had occasion to administer last rites or to counsel with people who knew that death was imminent?

A. Yes.

Q. When you do that, and they have chance (sic) to do that, have you been able to observe a peacefulness that has come over them?

A. Sometimes.

Q. Of course, usually it makes that person feel somewhat better, doesn't it?

A. I think so.

Q. And of course, if you're killed in your sleep, you don't get a chance to do that.

A. That is right.

Defendant failed to object to this line of questions, and now argues that the prosecutor's questions improperly excited the prejudices of the jury and turned their attention from the evidence and toward sympathy. We disagree.

The bounds of cross-examination are limited by two general principles: 1) the scope of the cross-examination rests within the sound discretion of the trial judge; and 2) the questions must be asked in good faith. *State v. Warren,* 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990) (citations omitted). A prosecutor's questions are presumed to be proper unless the record shows that they were asked in bad faith. *State v. Dawson,* 302 N.C. 581, 586, 276 S.E.2d 348, 351 (1981). Abuse of discretion is generally found when a prosecutor affirmatively places before the jury an incompetent and prejudicial matter by injecting his own knowledge, beliefs, or personal opinions or facts which are either not in evidence or not admissible. *Id.* at 585-86, 276 S.E.2d at 351.

In the instant case, the prosecutor did not place before the jury his own opinions or inadmissible evidence, and there is nothing tending to show that the testimony was elicited in bad faith or that the questioning exceeded the scope of permissible cross-examination. Thus, we find no abuse of discretion on the part of the trial court and no reversible error.

[6] In his next assignment of error, defendant contends that the court committed plain error in allowing inadmissible hearsay testimony from two witnesses. During defendant's treatment at the emergency room, Dr. Michael Hawkins and nurse Sherry Gurganus overheard defendant speaking on the phone to his parents. Dr. Hawkins testified that he overheard defendant tell someone during a telephone conversation that he did not know how his wife was doing. Nurse Gurganus testified that she overheard defendant tell his parents that "someone had broken into their house and there had been an accident." During the trial, defendant elicited virtually identical testimony from his parents concerning their recollection of the telephone conversation. Defendant's mother testified that when defendant called her from the emergency room, he told her that "there had been an accident and that someone had broken in and shot Sherry and him." Defendant's father testified that when he spoke with defendant, "he [defendant] said there had been an accident . . . that Sherry had been shot and she wasn't doing so well and he had been shot, but he was all right."

By eliciting this testimony, defendant waived any possible objection to the testimony at issue. See State v. Hunt, 325 N.C. 187, 381 S.E.2d 453 (1989) (references to defendant's home as "Fort Apache" was not error when no objection was made to earlier reference); see also 1 Brandis on North Carolina Evidence § 30 (3d ed. 1988) (when evidence is admitted over objection but the same evidence has theretofore been or is thereafter admitted without objection, the objection is waived). Defendant cannot meet his burden of establishing error under the plain error rule when virtually identical evidence is elicited by defendant from his own witnesses. This assignment of error is without merit.

[7] In defendant's final assignment of error, he contends that his sentence of life imprisonment constitutes cruel and unusual punishment. Defendant requests that this Court conduct a proportionality review and find that the automatic imposition of the life sentence in this case was cruel and unusual. In the alternative, defendant

requests that the Court hold that the statute providing for the automatic imposition of a life sentence is unconstitutional and remand his case to the superior court for a new sentencing hearing, following the same guidelines provided for other felonies. We decline both requests and reject defendant's final assignment of error.

This Court has held that neither imposition of a life sentence nor imposition of consecutive life sentences for first-degree murder constitutes cruel and unusual punishment. *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983); and *State v. Atkinson*, 298 N.C. 673, 686, 259 S.E.2d 858, 866 (1979). In *Ysaguire*, the Court noted that, in a noncapital case, it is exceedingly rare for an appellate court to be able to conclude that a sentence imposed is so grossly disproportionate as to violate the Eighth Amendment proscription of cruel and unusual punishment and that it is not required to conduct factual comparisons to different non-capital cases to determine whether a given sentence is constitutional. *Ysaguire*, 309 N.C. at 786 n.3., 309 S.E.2d at 441 n.3. In addition, this Court has rejected similar arguments made concerning mandatory life sentences in first-degree rape and first-degree sexual offense cases. *State v. Peek*, 313 N.C. 266, 328 S.E.2d 249 (1985) (first-degree rape); and *State v. Holley*, 326 N.C. 259, 388 S.E.2d 110 (1990) (first-degree sexual offense). We find our precedents both persuasive and controlling.

In defendant's trial, we find no prejudicial error.

No error.