HUNTER, JR, Robert, N., Judge.
Wesley Cesnik ("Defendant") petitions this Court for review of his convictions for one count of conspiracy to sell diazepam, and one count of possession with intent to sell or deliver diazepam. We grant Defendant's petition and affirm the judgment of the trial court.
I. Facts and Background
On 5 May 2015, a Wake County grand jury indicted Defendant on one count of conspiracy to sell diazepam and one count of possession with intent to sell or deliver diazepam. The case came for trial in Wake County Superior Court on 2 November 2015. The evidence tended to show the following.
Captain Orlando Soto ("Soto") of the Rolesville Police Department testified first for the State. On 20 May 2014, Soto received a report that two female bartenders at a Knightdale restaurant sold controlled substances. Soto worked with the North Carolina Alcohol Law Enforcement Agency ("ALE"), which sent two undercover agents to the restaurant to purchase controlled substances.
Meredith Shoaf ("Agent Shoaf"), one of the agents, testified next. After receiving a briefing from Agent Eric Hill ("Agent Hill"), Agent Shoaf and Agent Kevin Beverly ("Agent Beverly") enter the restaurant at approximately 9:41 p.m. on the night of 10 July 2014. Agent Shoaf asks Daphne Turner ("Turner"), one of the bartenders, if she had any controlled substances for sale. Turner points to Shawn Bunce ("Bunce"), and tells Agent Shoaf he might have some.
Agent Shoaf speaks with Bunce. After they play a bar game together, Agent Shoaf asks Bunce if he has any controlled substances, specifying Valium or Xanax. Bunce responds he can call someone and order some. Bunce goes to the bar, speaks with Turner, then makes a call on his cell phone and goes outside. Agent Shoaf estimated he remained outside for approximately 10 minutes. Bunce then returns to Agent Shoaf and tells her he has "ordered up" and the drugs will arrive in approximately 10 minutes. Bunce tells Agent Shoaf he does not have any money. They go outside together and work out a price of $20.00 for ten pills. Agent Shoaf gives Bunce the money and returns to the bar.
At approximately 10:50 p.m., Agent Shoaf sees Defendant enter the bar and speak with Bunce and an off-duty bartender, Crystal Modlin ("Modlin"). Agent Shoaf witnesses Defendant and Bunce "hand something to each other." She does not see anyone else hand anything to Bunce. Bunce then motions for Agent Shoaf to follow him outside near the front door, where he hands her ten small blue pills wrapped in a small drink napkin. Agent Shoaf identifies the pills as Xanax. Agent Shoaf then notifies Agents Hill and Beverly she had completed the purchase and is in possession of the pills.
Agents Shoaf and Beverly leave the restaurant approximately an hour later and meet Agent Hill at a predetermined location. Agent Shoaf gives the pills to Agent Hill. Agent Hill shows Agent Shoaf a Department of Motor Vehicles ("DMV") photograph of Defendant and Agent Shoaf identifies Defendant as the person who delivered the pills to Bunce.
Agent Hill testified next. As the lead investigator, he placed Agents Shoaf and Beverly in the restaurant, provided them with money and a vehicle, and took possession of any evidence gathered during the investigation. After Agents Shoaf and Beverly enter the restaurant, Agent Hill drives to a parking lot across the street from the restaurant. From there, he has a clear view of the restaurant's front door, patio seating area, and parking lot through his binoculars.
Agent Hill describes the difficulties of using visual or audio surveillance in an undercover operation in a bar. He remains in contact with Agents Shoaf and Beverly during the investigation via regular calls and texts to their cell phones. Agent Hill receives a text from Agent Shoaf alerting him a potential deal was in progress and describing Bunce. Agent Shoaf advises Agent Hill as to what Bunce was wearing, and he has on a walking boot or cast. Agent Hill observes an individual matching the description emerge from the restaurant and talk on his cell phone for approximately five to ten minutes.
A few minutes later, Agent Hill sees a gray SUV enter the restaurant's parking lot. A male individual gets out, briefly enters the restaurant, and then leaves without carrying any food items. Agent Hill does not get a clear look at him. He then receives a text message from Agent Shoaf alerting him the deal was complete and advising him to look out for a white male in a gray SUV that was leaving. Agent Hill checks the license plate number of the SUV with the DMV, and from the address on the registration identifies Defendant as the driver.
After Agents Shoaf and Beverly leave the restaurant, Agent Hill meets them at a pre-arranged location. Agent Shoaf transfers the pills to Agent Hill. Using a reference book, he identifies them as Xanax.
Amanda Aharon, ("Aharon") a forensic drug chemist with the Raleigh/Wake County City-County Bureau of Identification, testified next. The court accepted her as an expert in the area of forensic chemistry. She testified the pills' shape, color, and markings matched the description of diazepam in a pharmaceutical database. She tested the pills with a mass spectrometer, which confirmed the pills contained diazepam.
After Aharon's testimony, the State rested its case. Defendant moved for a judgment of acquittal based on insufficiency of the evidence. The court denied the motion.
Defendant's only witness was Bunce. Bunce admitted he sold ten Xanax pills to Agent Shoaf for $20.00. He testified he had a prescription for the pills. After Agent Shoaf asked him whether he had a controlled substance, Bunce tells her he can get them for her, but it will take some time because he is waiting for someone. He does not want her to know the pills belong to him. He then "went out to [his] truck, messed around for a little bit and got them, put them in a baggie, came back in ... five, ten minutes later[.]" He then gives Agent Shoaf the pills after he returns to the restaurant. Bunce testified he made a phone call while getting the pills, but it was only to another friend to inquire whether he was coming to the restaurant that night.
Bunce testified he saw Defendant at the restaurant that night. He shook hands with Defendant and made "idle chitchat." He denied Defendant handed him anything that night. Bunce only knows Defendant because Defendant's girlfriend, Modlin, works there and Defendant often comes to the restaurant to pick her up. He described the extent of their relationship as merely having had a few drinks together.
Bunce had also been charged with selling diazepam stemming from the same incident. He pled guilty and received two years' probation. Bunce testified he did not come forward at the time of his plea to tell the court Defendant was not guilty because he "thought it would incriminate [him]," and he believed Defendant might have already implicated him to police.
Under cross-examination, Bunce admitted he did not recall who he called that night and was unsure what time the sale took place. He testified when he was arrested on the night of the sale, he told the arresting officer "[y]ou got the wrong person." Bunce testified he had spoken with Defendant's attorney, William Delahoyde, ("Attorney Delahoyde") on two prior occasions, once in his jail cell the weekend prior to the trial, where they went over the police report together, and again on the date of the trial. After Bunce testified the lawyer representing him in another criminal matter did not know he was testifying in this case, the assistant district attorney then asked:
Q. You didn't tell the prosecutor at the time that you pled in and you didn't tell the judge when you pled in, this story, but now after Mr. Delahoyde has come in, without your actual attorney, now you're coming in to tell the story; is that right?
....
A. Yup.
On re-direct examination, Bunce testified he met with Attorney Delahoyde the week prior to the trial and Attorney Delahoyde attempted to speak with his attorney. After Bunce's attorney provided him with a copy of the police report, Bunce realized Defendant had not implicated him. Bunce then contacted Attorney Delahoyde, to "tell [him] that I was going to testify and tell the truth." Attorney Delahoyde then came to the jail that weekend to discuss his testimony, but he did not give Bunce a police report, and they did not go over it together. Attorney Delahoyde then arranged for Bunce to "have some clothes to come to court" in.
On re-cross-examination, Bunce testified his attorney provided him with a copy of the police report at his own request. Bunce wanted to "make sure that [Defendant] didn't say anything [to implicate him] before I came forward and told the truth." The State asked Bunce to clarify his testimony:
Q. Okay. And you have told this jury that you gave your attorney some information, that you didn't give your attorney some information, that-you told them earlier you went over a police report with [Attorney Delahoyde], but then you were saying-told [them] that you never went over the police report. Which story is it?
....
A. Yeah, he went over it with me. She went over it with me, my lawyer, and then he went over it with me.
Q. So he did go over the police report with you? Yes? Did he go over the police report with you?
A. No.
During this line of questioning, Attorney Delahoyde repeatedly objected that the district attorney's questioning was "cumulative and argumentative."
After Bunce's testimony, the defense rested its case. Defendant moved for a judgment of acquittal for the State's failure to prove its case. The trial court denied the motion.
After the charge conference, but before counsel's closing arguments, Defendant moved for a mistrial. Attorney Delahoyde argued he had "through my own inadvertence ... made myself a witness in this case." He argued he needed to testify as to the content of his meetings with Bunce in order to refute the State's suggestion "of either a recent fabrication or some other evil motive in [Bunce's] testimony." In reply, the State replied only "I don't think that that's grounds for a mistrial." The trial court denied the motion for mistrial.
After closing statements, the trial court instructed the jury. The jury found Defendant guilty of one count of conspiracy to sell or deliver diazepam, and guilty of one count of possession of diazepam with intent to sell or deliver. The trial court sentenced Defendant to two consecutive terms of six to seventeen months in prison, but suspended the sentence and placed Defendant on twenty-four months of supervised probation.
Defendant did not enter his notice of appeal in open court, but filed a written notice of appeal in the trial court on 12 November 2015. The notice of appeal did not designate the judgment Defendant wished to appeal. On 16 November 2015, Defendant filed a motion for judgment of acquittal notwithstanding the verdict. On 17 November 2015, the trial court filed an appellate entry for Defendant and appointed him appellate counsel.
II. Jurisdiction
Under the North Carolina Rules of Appellate Procedure, a defendant must either give oral notice of appeal at trial or file notice of appeal with the superior court clerk. N.C.R. App. P. 4(a) (2016). Where a defendant files a written notice of appeal. it must "designate the judgment or order from which appeal is taken and the court to which appeal is taken[.]" N.C.R. App. P. 4(b) (2016). Failure to comply with Rule 4 leaves this court without jurisdiction to hear the appeal. State v. McCoy , 171 N.C. App. 636, 638, 615 S.E.2d 319, 320 (2005).
However, when a defendant fails to give proper notice of appeal, we may consider his appeal via a petition for writ of certiorari pursuant to Rule 21(a)(1). Under this rule, the writ should issue only where:
the right to prosecute an appeal has been lost by failure to take timely action, or when no right of appeal from an interlocutory order exists, or for a review pursuant to N.C. Gen. Stat. § 15A-1422(c)(3) of an order of the trial court ruling on a motion for appropriate relief.
N.C. R. App. P. 21(a)(1) (2016).
Here, Defendant lost his right to appeal when his trial counsel failed to give oral notice of appeal at trial and then provided a defective written notice of appeal. Because Defendant "lost his right to appeal through no fault of his own," we grant his petition for writ of certiorari. State v. Gordon , 228 N.C. App. 335, 337, 745 S.E.2d 391, 363 (2013) (citation and internal quotation marks omitted).
III. Standards of Review
Defendant contends the trial court erred when it denied his motion for a mistrial. "[A] motion for mistrial in cases less than capital is addressed to the trial judge's sound discretion, and his ruling thereon (without findings of fact) is not reviewable without a showing of gross abuse of discretion." State v. Daye , 281 N.C. 592, 596, 189 S.E.2d 481, 483 (1972).
Defendant also argues the trial court erred in allowing the prosecutor to misrepresent testimony, make sarcastic comments, and harass Defendant's witness. "The control of cross-examination is left to the sound discretion of the trial court and its rulings thereon will not be disturbed absent a showing of abuse of discretion." State v. Lee , 335 N.C. 244, 271, 439 S.E.2d 547, 560 (1994)
"An abuse of discretion occurs when a ruling is 'manifestly unsupported by reason, which is to say it is so arbitrary that it could not have been the result of a reasoned decision.' " State v. Taylor , 362 N.C. 514, 538, 669 S.E.2d 239, 260 (2008) (quoting State v. T.D.R. , 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998) ).
IV. Analysis
A. Motion for Mistrial
Under the North Carolina General Statutes, "the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings ... resulting in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. § 15A-1061 (2015). Mistrial is a "drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict." Taylor , 362 N.C. at 538, 669 S.E.2d at 260. See also State v. Smith , 320 N.C. 404, 418, 358 S.E.2d 329, 337 (1987) ; State v. Stocks , 319 N.C. 437, 441, 335 S.E.2d 492, 494 (1987). The trial court's decision to grant or deny a mistrial is "entitled to great deference since [it] is in a far better position than an appellate court to determine the effect of any [misconduct] on the jury." State v. Thomas , 350 N.C. 315, 341, 514 S.E.2d 486, 502 (1999).
North Carolina Rule of Professional Conduct 3.7(a) states:
[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
A witness is "necessary" within the meaning of Rule 3.7(a) when his testimony is "relevant, material, and unobtainable by other means." State v. Smith , 230 N.C. App. 387, 391, 749 S.E.2d 507, 510 (2013) (quoting State v. Rogers , 219 N.C. App. 296, 304, 725 S.E.2d 342, 348 (2012) ). See also N.C. St. Bar, 2011 Formal Ethics Opinion 1.
Defendant contends he was entitled to a mistrial because Attorney Delahoyde became a necessary witness on his behalf and could no longer continue as his attorney under the North Carolina Rules of Professional Conduct after the State raised doubts about the motivations for Bunce's testimony. We disagree.
As the transcript suggests Bunce and Attorney Delahoyde met alone, Attorney Delahoyde's testimony almost certainly would have been unobtainable from another source. Similarly, Attorney Delahoyde's testimony was relevant, as it could "assist the jury in understanding the evidence." State v. Huang , 99 N.C. App. 658, 663, 394 S.E.2d 279, 283 (1990) (internal quotation marks and citation omitted).
Nonetheless, Attorney Delahoyde's testimony would not have been material to the case against Defendant. On cross-examination, the State asserted Bunce's testimony was driven by an unspecified ulterior motive stemming from a discussion with Attorney Delahoyde. Other doubts raised by the State on cross-examination included Bunce's inability to definitively recall the events of the night in question and whether Attorney Delahoyde reviewed the police report with Bunce prior to his testimony. On re-direct examination, Bunce testified Attorney Delahoyde did not give him anything in exchange for his testimony other than a change of clothes, and did not go over the police report with him. Moreover, Bunce maintained throughout his testimony his motive for testifying was a desire to clear Defendant's name after learning Defendant had not implicated him to law enforcement.
Because Attorney Delahoyde could only testify to facts within his own personal knowledge, his testimony would have been limited to corroborating Bunce's account of their meetings. N.C. Gen. Stat. § 8C, Rule 602 (2015) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.") The record does not show any evidence indicating Attorney Delahoyde was aware of Bunce's motives for testifying. Thus, Attorney Delahoyde could not testify to anything but what he personally observed at his meetings with Bunce and his testimony would have been of limited value in bolstering Bunce's credibility as a witness.
Consequently, we conclude Attorney Delahoyde's testimony was not material to the case against Defendant, he was not a necessary witness, and the trial court did not abuse its discretion by denying Defendant's motion for mistrial.
B. Controlling Cross-examination
Rule 611(a) of the North Carolina Rules of Evidence states "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." N.C. Gen. Stat. § 8C-1, Rule 611(a) (2015).
In applying this rule, our state's courts have held "the bounds of cross-examination are limited by two general principles: 1) the scope of the cross-examination rests with the sound discretion of the trial judge; and 2) the questions must be asked in good faith." State v. Bronson , 333 N.C. 67, 79, 423 S.E.2d 772, 779 (1992). The State is given "much latitude" on cross-examination to test issues raised on direct examination. State v. Warren , 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990). The State's questions are presumed to be in good faith absent a showing in the record that the questions were asked in bad faith. Id. at 373, 395 S.E.2d at 122.
Abuse of discretion in these circumstances arises when "a prosecutor affirmatively places before the jury an incompetent and prejudicial matter by injecting his own knowledge, beliefs, or personal opinions or facts which are either not in evidence or not admissible." Bronson , 333 N.C. at 79, 423 S.E.2d at 779.
Defendant argues the State misrepresented Bunce's testimony on direct examination when it questioned him regarding the time of day the sale occurred and his statement of innocence to the police upon his arrest. Further, Defendant contends the State injected humiliating and "snarky" commentary into its cross-examination which was designed to suggest Bunce's testimony was a fictional account.
While we recognize the State was aggressive on cross-examination, we do not agree the State's conduct placed any incompetent or prejudicial matters before the jury. The record contains no evidence the State inserted its own knowledge, beliefs, or opinions into its questioning, and contains no showing the State presented any fact not in evidence or inadmissible evidence during its questioning. As a result, we hold the trial court did not abuse its discretion in allowing the State to aggressively cross-examine Bunce.
For the foregoing reasons, the judgment of the trial court is
AFFIRMED.
Report per Rule 30(e).
Judges STROUD and DAVIS concur.