STATE OF NORTH CAROLINA v. ANDRE DEMETRIUS GREEN

No. 519A96

(Filed 30 July 1998)

**1. Constitutional Law § 162 (NCI4th)— first-degree sexual offense—thirteen-year-old defendant—transfer for trial as adult—statute not unconstitutionally vague**

N.C.G.S. § 7A-610 provides sufficient guidance to juvenile court judges in making transfer decisions and does not on its face violate due process principles embodied in the United States or North Carolina Constitutions. The first prong of the vagueness standard is met because the statute clearly puts citizens of ordinary intelligence on notice that thirteen-year-old offenders either will have their cases transferred to superior court or are in jeopardy of having their cases transferred if the juvenile court deems it warranted. The second prong is satisfied in that the statute, when examined in the light of related statutes and the circum-

stances surrounding enactment, provides juvenile court judges with sufficient guidance and criteria by which to make discretionary transfer rulings. The judge seeks to develop a disposition that takes into account the facts of the case, such as the seriousness of the crime, the viciousness of the attack, the injury caused and the strength of the State's case, and is guided by the needs and limitations of the juvenile as well as the strengths and weaknesses of the juvenile's family, and takes into account the protection of public safety and the legislature's growing concern with serious youthful offenders and increasing dissatisfaction with the ability of the juvenile system to provide either adequate public protection or rehabilitative service to the juvenile given the usual short period between conviction and release from the juvenile system.

2. **Infants or Minors § 99 (NCI4th)— transfer of juvenile cases to superior court—Kent factors—not constitutionally required—included in statute**

N.C.G.S. § 7A-610, which deals with the transfer of juvenile cases to superior court, is not constitutionally infirm without the factors set forth in the appendix to *Kent v. United States*, 383 U.S. 541. The *Kent* Court was merely exercising its supervisory role over the inferior court created by Congress for the District of Columbia. Moreover, all of the factors enunciated in *Kent* are already subjects of consideration by juvenile court judges and specifically appending the *Kent* factors would be duplicative and might unintentionally serve to limit the possible factors considered by juvenile court judges.

3. **Infants or Minors § 99 (NCI4th)— first-degree sexual offense—thirteen year old defendant—transfer to superior court—within statutory guidelines**

A juvenile court judge acted within the statutory guidelines of N.C.G.S. § 7A-610(c) in transferring to superior court a thirteen-year-old defendant accused of first-degree sexual offense and other crimes where the judge included in her transfer order as bases for her decision the seriousness of the offenses, that the victim was a stranger, the community's need to be aware of and protected from such serious crimes, defendant's history of assaultive behavior, defendant's acknowledgment of difficulty controlling his temper, and strong evidence of defendant's guilt considering his confession.

**4. Constitutional Law § 376 (NCI4th)— juvenile transferred to superior court—Equal Protection claim—no prima facie showing of discrimination**

A juvenile defendant failed to establish a *prima facie* showing of discrimination under the Equal Protection Clause in the transfer of juvenile offenders to superior court under N.C.G.S. § 7A-610, either on its face or as applied.

**5. Constitutional Law § 374 (NCI4th)— first-degree sexual offense—thirteen-year-old defendant—life sentence—not cruel and unusual**

Committing a thirteen-year-old defendant to a term of life imprisonment for first-degree sexual offense does not constitute cruel and unusual punishment for purposes of the Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 27 of the North Carolina Constitution. It has repeatedly been held that a mandatory life sentence for first-degree sexual offense is not cruel and unusual punishment, so that the issue is whether sentencing a thirteen-year-old to life imprisonment for first-degree sexual offense complies with evolving standards of decency. Examination of recent legislative history establishes that the legislature's reduction of the transfer age from fourteen to thirteen years was a reasonable reaction to a genuine public concern over the increase in violent juvenile offenders such as defendant. At this time, protection of law-abiding citizens from predators, regardless of ages, is on the ascendancy and it is the general consensus that serious youthful offenders must be dealt with more severely than has recently been the case in the juvenile system. An examination of defendant's punishment in this case indicates it clearly comports with the "evolving standards of decency" in society.

**6. Constitutional Law § 374 (NCI4th)— first-degree sexual offense—thirteen-year-old defendant—life sentence—not grossly disproportionate**

A sentence of life imprisonment for first-degree sexual offense for a defendant who was thirteen years old at the time of the crime was not grossly disproportionate to the crime committed. A criminal sentence fixed by the legislature must be proportionate to the crime committed, but the prohibition against cruel and unusual punishment does not require strict proportionality between crime and sentence and forbids only extreme sentences

**STATE v. GREEN**

[348 N.C. 588 (1998)]

that are grossly disproportionate to the crime. An examination of the crime committed by this defendant reveals it is not the type attributable to or characteristic of a "child," nor is it one for which the special considerations due children under the criminal justice system are appropriate. The circumstances of the crime show purpose and culpability rising far above that normally attributable to a thirteen-year-old juvenile and the cruelty of the attack, its predatory nature toward an essential stranger, defendant's refusal to accept full responsibility, his difficulty controlling his temper, his previous record and his unsupportive family situation all suggest he is not particularly suited to the purpose and type of rehabilitation dominant in the juvenile system. Moreover, defendant would have been subject to release only four years after his conviction, when he reached eighteen.

7. **Constitutional Law § 374 (NCI4th)— first-degree sexual offense—thirteen-year-old defendant—life sentence— penological theory—General Assembly determination**

A sentence of life imprisonment for first-degree sexual offense for a defendant who was thirteen years old when the crime was committed was not constitutionally excessive in that it was without penological justification. Although defendant contends that minor offenders should be treated rather than punished, the prohibition against cruel and unusual punishment does not mandate adoption of any one penological theory, and the General Assembly has determined that the adult justice system, with its primary goals of incapacitation and retribution, is the appropriate place for violent youthful offenders, such as defendant. It is not for the Supreme Court to second-guess that determination.

8. **Constitutional Law § 374 (NCI4th)— first-degree sexual offense—changing statutes—thirteen-year-old defendant to receive life sentence—not cruel and unusual**

A sentence of life imprisonment for first-degree sexual offense for a defendant who was thirteen years old when the crime was committed was not cruel and unusual because this is the only thirteen-year-old offender who will be sentenced to a mandatory life sentence for first-degree sexual offense as a result of lowering the minimum transfer age to thirteen effective 1 May and changing the prescribed mandatory life sentence for first-degree sexual offense effective 1 October. The North Carolina and United States Supreme Courts have not afforded separate

STATE v. GREEN

[348 N.C. 588 (1998)]

treatment to the words cruel and unusual, but have looked only to whether a particular punishment involves basic inhuman treatment. The fact that defendant was the only thirteen-year-old who chose to commit this heinous offense and thereby suffer the otherwise uniform and acceptable punishment prescribed is due to his own timing and nothing more than happenstance.

Justice FRYE concurring in part and dissenting in part.

Justices WHICHARD and PARKER join in this concurring and dissenting opinion.

On review of a substantial constitutional question, pursuant to N.C.G.S. § 7A-30(1), of a unanimous decision of the Court of Appeals, 124 N.C. App. 269, 477 S.E.2d 182 (1996), affirming judgments entered upon defendant's convictions of first-degree sexual offense, attempted first-degree rape, and first-degree burglary by Cashwell, J., on 26 January 1995 in Superior Court, Wake County. Heard in the Supreme Court 11 September 1997.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine Crawley Fodor, Assistant Appellate Defender, for defendant-appellant.*

*Smith Follin & James, by Seth R. Cohen; and Deborah K. Ross and Sandy S. Ma on behalf of the American Civil Liberties Union of North Carolina Legal Foundation, amicus curiae.*

LAKE, Justice.

This appeal presents for determination two separate but interrelated questions: first, whether the procedures by which juvenile court judges transfer cases to superior court are adequately protective of the due process rights of juveniles; and, if so, whether the sentencing of a thirteen-year-old, after such transfer and conviction, to a mandatory term of life imprisonment for first-degree sexual offense constitutes cruel and unusual punishment.

The defendant, Andre Demetrius Green, was thirteen years old on the date the crimes in this case were committed. On 28 July 1994, defendant was charged in juvenile petitions with first-degree rape and first-degree burglary, and on 9 August 1994, defendant was

charged in a juvenile petition with first-degree sexual offense. Upon the State's motion to transfer the charges to superior court, District Court Judge Joyce A. Hamilton held a probable-cause hearing on 18 August 1994 pursuant to N.C.G.S. §§ 7A-608 to -612 and determined that probable cause existed and granted the State's motion for transfer. Defendant filed a notice of appeal and a petition for writ of mandamus to the Court of Appeals. The State submitted a motion to dismiss the appeal as interlocutory. On 24 January 1995, the Court of Appeals dismissed the appeal as interlocutory and denied defendant's petition.

At the probable-cause hearing, a juvenile court psychologist who examined the defendant prior to the hearing testified defendant came from a home where his father was an alcoholic and cocaine abuser who provided no support for the family and had little contact with defendant as a child. Defendant's father also viewed pornographic material in the home, although there was no stated knowledge whether defendant had been exposed to it. Defendant had a history of assaultive behavior during both the past year and throughout his childhood. This was often a reaction to teasing he received about his speech impediment. The psychologist testified defendant had underlying neurological problems that made him more impulsive than other juveniles his age. Defendant admitted to the psychologist that he had a "very bad temper." However, defendant denied to the psychologist having assaulted the victim, notwithstanding being confronted with contradictions in his story.

In her order for transfer, the district court judge cited the following as reasons for adjudging that the best interests of the juvenile and the State would be served by transfer to superior court:

-[The] serious nature of the offenses;

-[The] victim [was] essentially a stranger to the juvenile;

-[The] community's need to be aware of & protected from this serious type of criminal activity;

-[The] juvenile has a history of assaultive behavior (fights in school) & juvenile acknowledges he had a very bad temper;

-strong evidence of probable cause presented based on testimony from victim and juvenile's confession to law enforcement.

Defendant was indicted on 13 September 1994 for all of the offenses alleged in the juvenile petitions. He was tried to a jury at the

**STATE v. GREEN**

[348 N.C. 588 (1998)]

24 January 1995 Criminal Session of Superior Court, Wake County, Judge Narley L. Cashwell presiding. The jury found defendant guilty of attempted first-degree rape, first-degree burglary, and first-degree sexual offense. The trial court sentenced defendant as a repeat offender and entered sentences of life imprisonment for first-degree sexual offense, six years' imprisonment for attempted first-degree rape to run concurrently with the life sentence, and fifteen years' imprisonment for first-degree burglary to run consecutively following the life sentence.

Defendant appealed to the Court of Appeals. In a unanimous opinion, the Court of Appeals found no error. Defendant is before this Court on a notice of appeal of a constitutional question. His petition for discretionary review as to additional issues was denied on 6 March 1997, as was the State's motion to dismiss the appeal.

The evidence at trial tended to show that for approximately six weeks prior to the night of 27 July 1994, the victim experienced repeated harassment from someone ringing her doorbell and banging on her doors and windows. The victim, a twenty-three-year-old mother of one, lived with her twenty-month-old son in an apartment in Fuquay-Varina. She kept a golf club beside her bed as a weapon due to the recent harassment.

On the night of 27 July 1994, the victim and her son were asleep in the same bed when a banging at the back door awakened her. She immediately called 911 for help and was on the phone with the 911 operator when she heard glass break on the back door. Defendant entered the victim's bedroom brandishing the handle from a mop and knocked the telephone from her hand. Defendant and the victim swung their respective weapons simultaneously. Both the golf club and the mop handle broke upon impact. Defendant then pulled the phone cord from the wall and knocked the victim onto the bed. He slapped her and told her, "shut up, b---h."

As the victim pleaded with defendant not to hurt her son, defendant told her he was going to "f--- [her]," and he pulled down her panties and forced her to the floor. Defendant pulled the victim's hair, slapped her several times and told her to spread her legs as he attempted to remove her shirt. Defendant then placed himself on top of the victim. During the assault, defendant fondled the victim's breasts, performed oral sex upon her, penetrated her vagina with his penis once or twice and inserted a finger in her vagina and anus. In the process, defendant told the victim he was going to "rip her insides

out." Defendant only ceased his attack when the victim told him she thought she heard the police. As the police were entering the back door, defendant escaped through the front door. In addition to the sexual assault, the victim suffered bruises and blood clots in her eyes as well as a scar on her face where she was cut.

Two witnesses, one who gave a description matching defendant's characteristics and one who knew defendant, saw defendant emerge from the victim's apartment after the arrival of the police. The victim picked defendant's picture out of a possible suspects book containing over one hundred photographs and identified defendant in open court as her assailant. Further, defendant gave a statement to police admitting to his sexual assault of the victim.

## I. Due Process

**[1]** In his first assignment of error, defendant contends that N.C.G.S. § 7A-610 violates his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the North Carolina Constitution. Defendant asserts section 7A-610 is unconstitutionally vague because it provides no meaningful guidance to juvenile court judges, resulting in arbitrary and discriminatory decisions regarding which juveniles to transfer to superior court. We find defendant's argument to be without merit.

Section 7A-610 provides in applicable part:

(a) If probable cause is found and transfer to superior court is not required by G.S. 7A-608, the prosecutor or the juvenile may move that the case be transferred to the superior court for trial as in the case of adults. *The judge may proceed to determine whether the needs of the juvenile or the best interest of the State will be served by transfer of the case to superior court for trial as in the case of adults.* When the case is transferred to superior court, the superior court has jurisdiction over that felony, any offense based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan of that felony, and any greater or lesser included offense of that felony.

N.C.G.S. § 7A-610(a) (1995) (emphasis added). The decision to transfer a juvenile's case to superior court lies solely within the sound discretion of the juvenile court judge and is not subject to review absent a showing of gross abuse of discretion. *In re Bunn*, 34 N.C. App. 614, 615-16, 239 S.E.2d 483, 484 (1977).

**STATE v. GREEN**

[348 N.C. 588 (1998)]

It is an essential element of due process of law that statutes contain sufficiently definite criteria to govern a court's exercise of discretion. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 227-28 (1972). As stated by the Supreme Court, "[d]iscretion without a criterion for its exercise is authorization of arbitrariness." *Brown v. Allen*, 344 U.S. 443, 496, 97 L. Ed. 469, 509 (1953). In construing whether a statute contains sufficient criteria to avoid being unconstitutionally vague, this Court applies well-established rules of statutory construction:

> In passing upon the constitutionality of the statute, we begin with the presumption that it is constitutional and must be so held unless it is in conflict with some constitutional provision of the State or Federal Constitutions. A well recognized rule in this State is that, where a statute is susceptible to two interpretations—one constitutional and one unconstitutional—the Court should adopt the interpretation resulting in a finding of constitutionality.

> Criminal statutes must be strictly construed. But, while a criminal statute must be strictly construed, the courts must nevertheless construe it with regard to the evil which it is intended to suppress. The intent of the legislature controls the interpretation of a statute. When the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein. But when a statute is ambiguous or unclear in its meaning, resort must be had to judicial construction to ascertain the legislative will, and the courts will interpret the language to give effect to the legislative intent. As this Court said in *State v. Partlow*, 91 N.C. 550[, 552] (1884), the legislative intent ". . . is to be ascertained by appropriate means and *indicia, such as the purposes appearing from the statute taken as a whole,* the phraseology, the words ordinary or technical, *the law as it prevailed before the statute, the mischief to be remedied, the remedy, the end to be accomplished, statutes in pari materia,* the preamble, the title, *and other like means. . . .*" Other *indicia* considered by this Court in determining legislative intent are the legislative history of an act and *the circumstances surrounding its adoption,* earlier statutes on the same subject, the common law as it was understood at the time of the enactment of the statute, and previous interpretations of the same or similar statutes.

*In re Banks*, 295 N.C. 236, 239-40, 244 S.E.2d 386, 388-89 (1978) (citations omitted) (emphasis added); *see also Taylor v. Taylor*, 343 N.C. 50, 56, 468 S.E.2d 33, 37 (1996); *State ex rel. Thornburg v. House and Lot Located at 532 B Street, Bridgeton*, 334 N.C. 290, 298, 432 S.E.2d 684, 688-89 (1993); *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 215, 388 S.E.2d 134, 140 (1990); *North Carolina Baptist Hosps., Inc. v. Mitchell*, 323 N.C. 528, 532, 374 S.E.2d 844, 846 (1988).

Under a challenge for vagueness, the Supreme Court has held that a statute is unconstitutionally vague if it either: (1) fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"; or (2) fails to "provide explicit standards for those who apply [the law]." *Grayned*, 408 U.S. at 108, 33 L. Ed. 2d at 227. This Court expressed an almost identical standard in the case of *In re Burrus*, 275 N.C. 517, 169 S.E.2d 879 (1969), *aff'd sub nom. Mckeiver v. Pennsylvania*, 403 U.S. 528, 29 L. Ed. 2d 647 (1971), where we stated:

> It is settled law that a statute may be void for vagueness and uncertainty. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." [16 Am. Jur. 2d *Constitutional Law* § 552 (1964)]; *Cramp v. Board of Public Instruction*, 368 U.S. 278, 7 L. Ed. 2d 285 [(1961)]; *State v. Hales*, 256 N.C. 27, 122 S.E.2d 768 [(1961)]. Even so, impossible standards of statutory clarity are not required by the constitution. *When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met.* [*United States v. Petrillo*, 332 U.S. 1, 91 L. Ed. 1877 (1947)].

*In re Burrus*, 275 N.C. at 531, 169 S.E.2d at 888 (emphasis added). In the instant case, defendant does not challenge the validity of the transfer statute on the first prong of the vagueness standard, the "notice" requirement. Nonetheless, an examination of the transfer statute reveals it provides adequate notice of its application. Because section 7A-610 appears in article 49 of the Juvenile Code, titled "Transfer to Superior Court," and because this section references section 7A-608, section 7A-610 must be read in light of section 7A-608. Section 7A-608 provides that, after notice, hearing, and a finding of probable cause, the juvenile court *may* transfer jurisdiction over a

juvenile to superior court if (1) the juvenile was at least thirteen years old at the time of the alleged offense, and (2) the offense would be a felony if committed by an adult. N.C.G.S. § 7A-608 (1995). Furthermore, section 7A-608 *requires* the juvenile court to transfer a juvenile to superior court if the alleged offense is a class A felony. *Id.* Section 7A-610 provides that for offenses *other* than class A felonies, the juvenile court may determine whether "the needs of the juvenile or the best interest of the State will be served by transfer of the case to superior court." N.C.G.S. § 7A-610(a). Thus, this statute clearly puts citizens of ordinary intelligence on notice that thirteen-year-old offenders either will have their cases transferred to superior court or are in jeopardy of having their cases transferred if the juvenile court deems it warranted. The first prong of the vagueness standard is plainly met.

Regarding the second prong of the vagueness test, the "guidance" component, examination of section 7A-610 in light of the entire juvenile and criminal codes establishes that the statute provides juvenile court judges with sufficient guidance and criteria by which to make discretionary transfer rulings. As noted above, the rules of statutory construction provide, where the language of a statute is arguably ambiguous, that courts must give effect to legislative intent by reference *inter alia* to statutes *in pari materia*, those having a common purpose. Thus, we should not look, as defendant would have us do, solely to N.C.G.S. § 7A-610 of article 49 of the North Carolina Juvenile Code (subchapter XI of chapter 7A) to determine whether juvenile court judges are provided with adequate guidance for transfer decisions.

Section 7A-610 is part of the larger Juvenile Code which seeks to rehabilitate juveniles and to transform them into productive, law-abiding members of society. *See State v. Dellinger*, 343 N.C. 93, 96, 468 S.E.2d 218, 221 (1996). The Juvenile Code is similarly intertwined with the Criminal Procedure Act, chapter 15A of the General Statutes, and the Criminal Law, chapter 14 of the General Statutes, as the Juvenile Code is the source of original jurisdiction and procedure regarding the adjudication of crimes committed by juveniles. *See* N.C.G.S. § 7A-523 (1995). Hence, when a juvenile court judge seeks to determine whether "the needs of the juvenile or the best interest of the State will be served by transfer," in accord with section 7A-610(a), he or she does so within the structure of the entire criminal justice system. Examination, therefore, must be made with reference to this

larger statutory construct in deciding whether the guidance provided to juvenile court judges passes constitutional muster.

N.C.G.S. § 7A-516(3) provides that the purpose of the Code as it applies to juveniles is

[t]o develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the child, the strengths and weaknesses of the family, and the protection of the public safety.

N.C.G.S. § 7A-516(3) (1995). Article 52 of the Code governs "Dispositions," and it (1) states the goal of dispositions in juvenile cases and (2) identifies dispositional alternatives for the juvenile court. N.C.G.S. §§ 7A-646 to -661 (1995). In considering possible dispositions, the juvenile court is to consider "the seriousness of the offense, the degree of culpability indicated by the circumstances of the particular case and the age and prior record of the juvenile." N.C.G.S. § 7A-646.

The circumstances surrounding the enactment of the transfer statute and related statutes also provide insight into the legislature's provision of guidance for juvenile court transfer decisions. N.C.G.S. § 7A-608 provides that juveniles accused of the class A felony of first-degree murder *must* be transferred to superior court. N.C.G.S. § 7A-608. Moreover, section 7A-608 was recently amended to reduce the age at which juveniles either must or may be transferred to superior court from fourteen to thirteen years of age. Crime Control Act of 1994, ch. 22, sec. 25, 1993 N.C. Sess. Laws (Extra Session 1994) 62, 75 (effective May 1, 1994, for offenses committed on or after that date). These circumstances as developed recently and over a longer period provide the juvenile court judge with two important considerations for deciding whether to transfer a juvenile case: (1) the seriousness of the offense; and (2) the evolving standards and will of the majority in society, as expressed through the legislature, reflecting concern that the rapid increase in the commission of serious, violent crimes by younger and younger offenders must be dealt with more stringently than was previously being done in the juvenile system.

When examined in the light of related statutes and the circumstances surrounding enactment, the standard by which juvenile court judges must adjudge transfers is anything but vague. When a juvenile court judge decides transfer meets "the needs of the juvenile or [serves] the best interest of the State," N.C.G.S. § 7A-610(a), he or she

does so with full knowledge of the dispositional alternatives in the juvenile and adult systems. The juvenile court judge seeks to develop a disposition that takes into account the facts of the case, such as the seriousness of the crime, the viciousness of the attack, the injury caused and the strength of the State's case. The juvenile court judge's decision is also guided by the needs and limitations of the juvenile, as well as the strengths and weaknesses of the juvenile's family. Moreover, the juvenile court judge takes into account the protection of public safety and the legislature's growing concern with serious youthful offenders and increasing dissatisfaction with the ability of the juvenile system to provide either adequate public protection or rehabilitative service to the juvenile given the usual short period of time between conviction and release from the juvenile system. We thus conclude that N.C.G.S. § 7A-610, in light of the entire Juvenile Code, provides sufficient guidance to juvenile court judges in making transfer decisions and does not on its face violate due process principles embodied in the United States Constitution or the North Carolina Constitution.

[2] Additionally, defendant maintains that section 7A-610 is infirm without the "*Kent* factors" set forth in the appendix to the Supreme Court's decision in *Kent v. United States*, 383 U.S. 541, 16 L. Ed. 2d 84 (1966), and urges this Court to adopt the factors as the standard by which juvenile court judges must make transfer determinations. In *Kent*, the Supreme Court enunciated a list of factors for the Juvenile Court of the District of Columbia to consider in making transfer decisions. The factors on the list consist of the following:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment . . . .

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime . . . .

6. The sophistication and maturity of the [j]uvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

*Kent*, 383 U.S. at 566-67, 16 L. Ed. 2d at 100-01.

As an initial matter, it is important to note that the Supreme Court nowhere stated in *Kent* that the above factors were constitutionally required. In appending this list of factors to its opinion, the *Kent* Court was merely exercising its supervisory role over the inferior court created by Congress for the District of Columbia. Thus, the factors in the Appendix to *Kent* have no binding effect on this Court.

Moreover, examination of section 7A-610 in conjunction with the statutes *in pari materia* reveals that substantially all of the factors enunciated by the Supreme Court in *Kent* are already subjects of consideration by our juvenile court judges in transfer determinations. Specifically appending the factors set forth in *Kent* to a statutory scheme already protective of due process considerations would be needlessly duplicative. In fact, doing so might in the future unintentionally serve to limit the universe of possible factors considered by juvenile court judges in making a decision that, of necessity, requires discretionary balancing of innumerable weights, including those that are presently unforeseeable to this or any other court.

[3] We now must decide whether the juvenile court judge in the case *sub judice* acted within the above statutory guidelines. Any order of transfer must contain the reasons underlying the decision to transfer. N.C.G.S. § 7A-610(c). However, the decision to transfer a juvenile's case to superior court lies solely within the sound discretion of the hearing judge. *In re Bunn*, 34 N.C. App. at 615-16, 239 S.E.2d at 484. Here, the juvenile court judge included in her transfer order the following bases for her decision: the seriousness of the offenses, the

fact that the victim was a stranger to the juvenile, the community's need to be aware of and protected from such serious crimes, defendant's history of assaultive behavior, defendant's acknowledgment of difficulty controlling his temper, and the strong evidence of defendant's guilt considering his confession. These findings are supported by evidence on the record from the transfer hearing. This serves as sufficient support for the juvenile court judge's discretionary transfer decision within the adequate due process guidelines of this state's statutory framework. Moreover, even if this Court were to adopt the *Kent* factors, which it does not, the juvenile court judge's decision substantially includes consideration of all the *Kent* factors relevant to this case. This assignment of error is overruled.

[4] In a related assignment of error, defendant maintains that section 7A-610 violates equal protection of the law in a racially discriminatory manner because it operates to transfer disproportionate numbers of black juvenile offenders to the superior court. Defendant makes no argument that the statute, as applied, operated to discriminate against him on a racial basis. Defendant merely presents statistics showing that a significant portion of the juveniles transferred to superior court are black. Defendant does not, however, present any statistics showing how this relates to the percentage of crimes committed by black juveniles as a whole, or the seriousness of those crimes as compared to those attributable to individuals of other racial groups. Without such comparison, defendant's statistics are meaningless. Defendant presents no other evidence suggesting that section 7A-610 is discriminatory. As such, defendant has failed to establish a *prima facie* showing of discrimination under the Equal Protection Clause, either on its face or as it is applied, and this assignment of error is overruled.

## II. Cruel and Unusual Punishment

[5] In his next assignment of error, defendant contends that committing a thirteen-year-old defendant to a term of life imprisonment for first-degree sexual offense constitutes cruel and unusual punishment for purposes of the Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 27 of the North Carolina Constitution. Defendant's argument is threefold: first, sentencing a thirteen-year-old to life imprisonment does not comport with current societal standards of decency; second, defendant's sentence is disproportionate to the crime committed and without penological justification; and third, defendant's sentence is cruel and

unusual because defendant is the only thirteen-year-old who will be sentenced to a mandatory life sentence for first-degree sexual offense. We find defendant's contentions to be without merit.

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" U.S. Const. amend. VIII (emphasis added). Article I, Section 27 of the North Carolina Constitution mirrors the language of the Eighth Amendment, except Section 27 prohibits "cruel *or* unusual punishments." N.C. Const. art. I, § 27 (emphasis added). However, this Court historically has analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions.[1] *See, e.g., State v. Bronson,* 333 N.C. 67, 423 S.E.2d 772 (1992); *State v. Rogers,* 323 N.C. 658, 374 S.E.2d 852 (1989); *State v. Peek,* 313 N.C. 266, 328 S.E.2d 249 (1985); *State v. Higginbottom,* 312 N.C. 760, 324 S.E.2d 834 (1985); *State v. Fulcher,* 294 N.C. 503, 243 S.E.2d 338 (1978). As the Supreme Court stated in *Trop v. Dulles,* 356 U.S. 86, 2 L. Ed. 2d 630 (1958):

> Whether the word "unusual" has any qualitative meaning different from "cruel" is not clear. On the few occasions this Court has had to consider the meaning of the phrase, precise distinctions between cruelty and unusualness do not seem to have been drawn. These cases indicate that the Court simply examines the particular punishment involved in light of the basic prohibition against inhuman treatment, without regard to any subtleties of meaning that might be latent in the word "unusual."

*Id.* at 100 n.32, 2 L. Ed. 2d at 642 n.32 (citations omitted). Thus, we examine each of defendant's contentions in light of the general principles enunciated by this Court and the Supreme Court guiding cruel and unusual punishment analysis.

Defendant first argues that his sentence contravenes current standards of decency. This argument finds its origin in *Trop v. Dulles,* one of the classic cases on the Eighth Amendment. There, the

---

1. In *Medley v. N.C. Dep't of Correction,* 330 N.C. 837, 412 S.E.2d 654 (1992), Justice Martin suggested in his lone concurrence that the protection afforded under the state Constitution might be broader than that provided by the Eighth Amendment, stating, "The disjunctive term 'or' in the State Constitution expresses a prohibition on punishments more inclusive than the Eighth Amendment." *Id.* at 846-47, 412 S.E.2d at 660 (Martin, J., concurring). However, research reveals neither subsequent movement toward such a position by either this Court or the Court of Appeals nor any compelling reason to adopt such a position.

Supreme Court traced the historic foundations of the Eighth Amendment and stated: "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." *Id.* at 100, 2 L. Ed. 2d at 642. Noting that "the words of the Amendment are not precise, and that their scope is not static[,] [t]he Amendment must draw its meaning from the *evolving standards of decency that mark the progress of a maturing society.*" *Id.* at 100-01, 2 L. Ed. 2d at 642 (emphasis added). The Court expounded upon this principle in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859 (1976). In *Gregg*, the Court counseled that since the prohibition against cruel and unusual punishment is not a static concept, courts should look to objective indications of society's current values in determining whether the punishment in question complies with such "evolving standards." *Id.* at 173, 49 L. Ed. 2d at 874. In so doing, however, the *Gregg* Court warned, "we may not act as judges as we might as legislators," *id.* at 174, 49 L. Ed. 2d at 875, and quoted Justice Frankfurter in setting forth the rationale for such caution:

> "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures."

*Id.* at 175, 49 L. Ed. 2d at 875 (quoting *Dennis v. United States*, 341 U.S. 494, 525, 95 L. Ed. 1137, 1160-61 (1951) (Frankfurter, J., concurring in affirmance of judgment)). The *Gregg* Court went on to explain:

> Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

> This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the

legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people."

*Id.* at 175, 49 L. Ed. 2d at 876 (quoting *Furman v. Georgia*, 408 U.S. 238, 383, 33 L. Ed. 2d 346, 432 (1972) (Burger, C.J., dissenting)). As the Supreme Court more recently reiterated, "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Penry v. Lynaugh*, 492 U.S. 302, 331, 106 L. Ed. 2d 256, 286 (1989); *see also Stanford v. Kentucky*, 492 U.S. 361, 370, 106 L. Ed. 2d 306, 318 (1989) (" 'First' among the ' "objective indicia that reflect the public attitude toward a given sanction" ' are statutes passed by society's elected representatives.").

This Court similarly has recognized that substantial deference is to be afforded the legislature because it is the role of the legislature and not the courts to decide the proper punishment for individuals convicted of a crime. *Higginbottom*, 312 N.C. at 763-64, 324 S.E.2d at 837; *State v. Cradle*, 281 N.C. 198, 209, 188 S.E.2d 296, 303, *cert. denied*, 409 U.S. 1047, 34 L. Ed. 2d 499 (1972).

An examination of defendant's punishment in this case indicates it clearly comports with the "evolving standards of decency" in society. Effective 1 May 1994, the General Assembly lowered the age of possible transfer to superior court from fourteen to thirteen years of age. Ch. 22, secs. 25-27, 1993 N.C. Sess. Laws (Extra Session 1994) at 75. Prior to 1 October 1994, individuals convicted of first-degree sexual offense were subject to a mandatory term of life imprisonment. N.C.G.S. § 14-1.1 (1986) (superseded by N.C.G.S. § 15A-1340.17 (1997) (making life imprisonment mandatory only for first-degree murder)). Defendant committed the crimes for which he was convicted on 27 July 1994. Once he was transferred to superior court and found guilty of first-degree sexual offense, defendant was sentenced to the mandatory punishment of life imprisonment. Our State's appellate courts repeatedly have held that a mandatory life sentence for first-degree sexual offense is not cruel and unusual punishment under either the state or federal Constitutions. *State v. Holley*, 326 N.C. 259, 262, 388 S.E.2d 110, 111 (1990); *State v. Cooke*, 318 N.C. 674, 679, 351 S.E.2d 290, 293 (1987); *Higginbottom*, 312 N.C. at 764, 324 S.E.2d at 837. Therefore, the issue is whether sentencing a *thirteen-year-old* to life imprisonment for first-degree sexual offense complies with evolv-

ing standards of decency so as not to be cruel and unusual punishment.

Examination of recent legislative history establishes that the legislature's reduction of the transfer age from fourteen to thirteen years was a reasonable reaction to a genuine public concern over the increase in violent juvenile offenders such as defendant. In 1993, 1,070 juveniles under the age of *fifteen* were arrested for violent crimes, an increase of over *249%* from 1984. State of North Carolina Uniform Crime Report 1994, at 155, 157, State Bureau of Investigation, Raleigh, N.C. (July 1995). This reflected an overall increase in juvenile arrests, which increased 191% from 1984 to 1993. *Id.* at 157. Public concern over rising crime served as the impetus for the Governor to call the General Assembly into an extra session in 1994 devoted exclusively to crime. In the proclamation establishing the extra session, the Governor pronounced, "Crime is the most urgent issue facing our State." Proclamation by Governor James B. Hunt, Feb. 8, 1994, Raleigh, N.C., *printed in* N.C. House Journal 9, Extra Session 1994. Noting the state was facing a "crisis in crime," the Governor convened the General Assembly "for the purpose of considering legislation to . . . toughen punishment for youthful offenders." *Id.* at 10.

At legislative hearings, city and county officials, prosecutors, judges, educators, juvenile social service providers, police officers, crime victims and many others voiced their concerns and suggestions about stemming rising crime rates. Verbatim Transcript, Public Hearings before the Senate of the N.C. General Assembly Sitting as a Committee of the Whole in Extra Session on Crime, Feb. 8-9, 1994, Raleigh, N.C., *printed in* N.C. Senate Journal, Extra Session 1994. Chief among the concerns, especially among city and county leaders, was the growing number of younger and younger violent offenders. *Id.* at 245-46, 249. Pasquotank County Commissioner Zee Lamb noted, "School and juvenile violence . . . has our citizens up in arms." *Id.* at 251. Giving several examples of violent youthful offenders, District Court Judge Margaret Sharpe testified, "It's not unusual to see 11-12-13-year-olds committing rape and other serious sexual assaults." *Id.* at 328. In discussing how to deal with these juveniles, High Point Mayor Rebecca Smothers, stated that "[t]he current juvenile code is hopelessly outdated," *id.* at 249, and District Attorney for the First Judicial District H.P. Williams explained, "in our juvenile system . . . there are no consequences, and as a result of there being no consequences, there's no reason [for juveniles] to behave," *id.* at

264. As a result of deficiencies in the juvenile system, Chief District Court Judge for the Fifth Judicial District Jacqueline Morris-Goodson testified, "by the time that we are getting these young people, many of them are in open rebellion against all authority. We ask [as district court judges] that you give us some means to detain them. You have basically taken away the opportunity that we have to say to young people when they come to us, that the court means business about what we say to you, and that we will back it up." *Id.* at 291.

These concerns and suggestions resulted in numerous pieces of legislation affecting juvenile offenders during the crime session. In addition to lowering the minimum transfer age, the legislature passed laws permitting the use of juvenile records in the guilt phase of later adult trials, prohibiting the expunction of juvenile records for certain severe offenses, requiring probable-cause hearings in all potential transfer cases, mandating notification of a minor's parents when a minor is charged with an offense and establishing numerous crime-prevention programs for juveniles. North Carolina Legislation 1994, at 157-60 (Inst. of Gov't, Univ. of N.C. at Chapel Hill, John L. Sanders ed. 1995). During the 1994 extra crime session of the legislature, the general consensus of the people through their elected representatives was that violent youthful offenders were a substantial threat to the security and well-being of society, and they must be dealt with in a more severe manner. Such sentiment found expression through the legislature's reduction of the minimum transfer age from fourteen to thirteen years of age.

To paraphrase the Supreme Court: "These and other facts and reports detailing the pernicious effects of [juvenile crime] in this [state] do not establish that [our state's] penalty scheme is correct or the most just in any abstract sense. But they do demonstrate that the [North Carolina] Legislature could with reason conclude that the threat posed to the individual and society by [juvenile crime] . . . is momentous enough to warrant the deterrence and retribution of [lowering the transfer age from fourteen to thirteen years of age]." *Harmelin v. Michigan*, 501 U.S. 957, 1003, 115 L. Ed. 2d 836, 870 (1991) (Kennedy, J., concurring in part and concurring in the judgment).

Moreover, North Carolina is far from alone in its treatment of youthful offenders for serious crimes such as first-degree sexual offense. Of at least eighteen other states permitting waiver or transfer of offenders thirteen or under to adult court: Georgia, Illinois and

Mississippi also have thirteen years as a minimum age, Ga. Code Ann. § 15-11-39 (1994), 705 Ill. Comp. Stat. 405/5-4 (West Supp. 1998), Miss. Code Ann. § 43-21-157 (Supp. 1997); Colorado, Missouri and Montana have twelve as a minimum age, Colo. Rev. Stat. § 19-2-518 (1997), Mo. Ann. Stat. § 211.071 (West 1996), Mont. Code Ann. § 41-5-206 (1997); Vermont permits transfer at age ten for sexual assault, Vt. Stat. Ann. tit. 33, § 5506(a)(10) (1991); and Alaska, Arizona, Delaware, Idaho, Maine, Nebraska, New Hampshire, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, and Wyoming have no minimum age for trial as an adult for sexual offense, Alaska Stat. § 47.12.100 (Michie 1996), Ariz. Rev. Stat. R. Juv. Ct. Pro. 12, 14 (1998), Del. Code Ann. tit. 10, §§ 937, 938 (rev. 1974), Idaho Code §§ 20-508, 20-509 (1997), Me. Rev. Stat. Ann. tit. 15, § 3101 (West Supp. 1997), Neb. Rev. Stat. §§ 43-261, 43-276 (1993), N.H. Rev. Stat. Ann. § 169-B:24 (Supp. 1997), Okla. Stat. Ann. tit. 10, § 7303-4.3 (West 1998), Or. Rev. Stat. §§ 419C.349, 419.352 (1997), R.I. Gen. Laws §§ 14-1-7, 14-1-7.2 (1994), S.D. Codified Laws §§ 26-11-1, 26-11-4 (Michie 1998), Tenn. Code Ann. § 37-1-134 (1996), Wyo. Stat. Ann. § 14-6-237 (Michie 1997). Although this state's possible life-imprisonment punishment of thirteen-year-olds for a first-degree sexual offense would not be *per se* unconstitutional even were it the only state to do so, *Harmelin*, 501 U.S. at 1000, 115 L. Ed. 2d at 868 (Kennedy, J., concurring in part and concurring in the judgment), the growing minority of states allowing such punishment is indicative of the public sentiment toward violent youthful offenders.

While this circumstance may indeed be a sad commentary on the state of our youth and the general decline of values in our society and a truly grievous fact, it is not of necessity and by virtue thereof unconstitutional. "Evolving standards of decency" are not fixed in time and place, nor are they always focused solely on the rights of criminals. At this time, protection of law-abiding citizens from their predators, regardless of the predators' ages, is on the ascendancy in our state and nation. Similarly, it is the general consensus that serious youthful offenders must be dealt with more severely than has recently been the case in the juvenile system. These tides of thought may ebb in the future, but for now, they predominate in the arena of ideas. Thus, we conclude that sentencing a thirteen-year-old defendant to mandatory life imprisonment for commission of a first-degree sexual offense is within the bounds of society's current and evolving standards of decency.

**[6]** Having found defendant's sentence to be within evolving standards of decency, we must nonetheless examine whether it is otherwise excessive in a constitutional sense. *E.g.*, *Gregg*, 428 U.S. at 173, 49 L. Ed. 2d at 874-75 (noting that public standards of decency are not always conclusive and that punishment must neither inflict unnecessary pain nor be grossly disproportionate to the crime). Defendant maintains his punishment is excessive because it is disproportionate to the crime committed. This is based on the assertion that mandatory life imprisonment is a penalty too harsh for a thirteen-year-old "child" convicted of first-degree sexual offense. We do not agree.

It is well established that punishment within the maximum fixed by the legislature through statute is not cruel and unusual unless the punishment provisions of the statute itself are unconstitutional. *State v. Williams*, 295 N.C. 655, 679, 249 S.E.2d 709, 725 (1978). This Court has frequently enunciated the principle that a criminal sentence fixed by the legislature must be proportionate to the crime committed. *E.g.*, *Peek*, 313 N.C. at 275, 328 S.E.2d at 255; *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 440 (1983). However, in *Harmelin*, 501 U.S. 957, 115 L. Ed. 2d 836, the United States Supreme Court held that outside of the capital context, there is no general proportionality principle inherent in the prohibition against cruel and unusual punishment. *Id.* at 992-94, 115 L. Ed. 2d at 863-64; *see also Bronson*, 333 N.C. at 81, 423 S.E.2d at 780. Indeed, the prohibition against cruel and unusual punishment "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001, 115 L. Ed. 2d at 869 (Kennedy, J., concurring in part and concurring in the judgment) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 77 L. Ed. 2d 637, 647 (1983)); *see also Rummel v. Estelle*, 445 U.S. 263, 271, 63 L. Ed. 2d 382, 389 (1980) ("grossly disproportionate"); *Coker v. Georgia*, 433 U.S. 584, 592, 53 L. Ed. 2d 982, 989 (1977) ("grossly out of proportion" sentences prohibited); *Weems v. United States*, 217 U.S. 349, 371, 54 L. Ed. 793, 800 (1910) ("greatly disproportioned" sentences prohibited). Only in exceedingly rare noncapital cases will sentences imposed be so grossly disproportionate as to be considered cruel or unusual. *Rummel*, 445 U.S. at 272, 63 L. Ed. 2d at 389; *Peek*, 313 N.C. at 276, 328 S.E.2d at 255.

Defendant claims his sentence of life imprisonment is grossly disproportionate because of his young age. While the chronological age of a defendant is a factor that can be considered in determining whether a punishment is grossly disproportionate to the crime, the

Court's review is not limited to this factor. The Court may look at other factors, including the severity of the crime and defendant's eligibility for parole. Moreover, as in capital sentencing proceedings, the number of years a defendant has spent on this planet is not solely determinative of his "age." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983). Due to factors such as life experience, knowledge level, psychological development, criminal familiarity, and sophistication and severity of the crime charged, a criminal defendant may be deemed to possess the wisdom and age of individuals considerably older than his chronological age. *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986).

An examination of the crime committed by defendant in this case reveals it is not the type attributable to or characteristic of a "child," nor is it one for which the special considerations due children under the criminal justice system are appropriate. Defendant apparently stalked and harassed his victim for several weeks. He forcefully broke into the victim's apartment and attacked her with a weapon. With full knowledge that the police had been alerted, defendant proceeded to sexually assault the victim, in a variety of ways, in her own bedroom in front of her child in a humiliating and highly vicious manner. Defendant yielded his attack only when the police arrived, and he waited literally until the last moment possible, escaping out the front door as police entered through the rear. These circumstances show purpose and culpability on defendant's part rising far above that normally attributable to a thirteen-year-old juvenile. The cruelty of the attack, its predatory nature toward an essential stranger, defendant's refusal to accept full responsibility, his difficulty controlling his temper, his previous record and his unsupportive family situation all suggest defendant is not particularly suited to the purpose and type of rehabilitation dominant in the juvenile system. Moreover, defendant would have been subject to release only four years after his conviction, at the time he achieved eighteen years of age. Considering these factors, we hold that defendant's sentence within the adult system is plainly not grossly disproportionate to the crime he committed.

**[7]** Defendant also claims his punishment is excessive because it is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg*, 428 U.S. at 183, 49 L. Ed. 2d at 880. This is based on defendant's assertion that minor offenders should be "treated" instead of "punished." However, the prohibition against cruel and unusual punishment "does not mandate adoption of any one penological theory." *Harmelin*, 501 U.S. at 999, 115 L. Ed. 2d

at 867 (Kennedy, J., concurring in part and concurring in the judgment). As with criminal sentences, the theories underlying those sentences change over time. *Payne v. Tennessee*, 501 U.S. 808, 819-20, 115 L. Ed. 2d 720, 731-32 (1991). "[S]tate criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation." *Harmelin*, 501 U.S. at 999, 115 L. Ed. 2d at 867-68 (Kennedy, J., concurring in part and concurring in the judgment). The General Assembly has determined that the adult justice system, with its primary goals of incapacitation and retribution, is the appropriate place for violent youthful offenders, such as defendant. It is not for this Court to second-guess this determination. As Justice Blackmun noted in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346:

> We should not allow our personal preferences as to the wisdom of legislative . . . action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great.

*Id.* at 411, 33 L. Ed. 2d at 448-49 (Blackmun, J., dissenting). We properly resist any such temptation, and hold defendant's argument to be without merit.

[8] In his final argument, defendant contends his punishment is cruel and unusual because he is the only thirteen-year-old offender who will be sentenced to a mandatory life sentence for first-degree sexual offense. The legislature lowered the minimum transfer age from fourteen to thirteen years of age effective 1 May 1994. At that time, the prescribed punishment for first-degree sexual offense was a mandatory term of life imprisonment under the old Fair Sentencing Act. N.C.G.S. § 14-1.1 (1986) (repealed 1994). With implementation of the Structured Sentencing Act, mandatory life imprisonment was abolished for first-degree sexual offense on 1 October 1994. N.C.G.S. § 15A-1340.17 (1997). As a result, there was a four-month "window" of opportunity wherein a thirteen-year-old first-degree sexual offender could potentially face mandatory life imprisonment for conviction. Since defendant was the only thirteen-year-old to commit first-degree sexual offense during this "window," to have his case subsequently transferred to superior court, and to be convicted of the crime, he is the only thirteen-year-old who will be sentenced to a mandatory term of life imprisonment under this statutory scheme as it existed. Defendant contends this result is so unusual that it rises to the level of being unconstitutional. We disagree.

**STATE v. GREEN**

[348 N.C. 588 (1998)]

The fact that a particular punishment is "unusual," in the sense that few defendants fall within its purview, is largely irrelevant to our inquiry. As noted above, this Court and the United States Supreme Court traditionally have not afforded separate treatment to the words "cruel" and "unusual," but have looked only to whether a particular punishment involves basic inhuman treatment. In the few cases where punishments have been held unconstitutional due to their apparent "unusualness," the punishments involved treatment so far-removed from accepted forms of punishment in this society that they amounted to basic inhumanity or cruelty. *See Rummel*, 445 U.S. at 274-75, 63 L. Ed. 2d at 391 (punishment "unique" only if it is a form different from "more traditional forms . . . imposed under the Anglo-Saxon system"); *Weems*, 217 U.S. at 364-82, 54 L. Ed. at 797-805 (Philippine court sentence of "cadena temporal," hard and painful labor in permanent chains, held cruel and unusual due to unfamiliarity with Anglo-American punishment tradition). Defendant's punishment of ordinary imprisonment in no way approaches such a level.

Defendant makes much of the fact that he is the only thirteen-year-old who will be or was sentenced under the statute that specified *mandatory* life imprisonment for first-degree sexual offense. However, the fact that defendant is the only criminal to suffer such punishment is nothing more than coincidence. Had two, or two hundred, thirteen-year-olds committed first-degree sexual offenses during the four-month "window" of possible punishment, the law as then written would have applied to all equally. The fact that defendant was the only thirteen-year-old who chose to commit this heinous offense and thereby suffer the otherwise uniform and acceptable punishment prescribed is due to his own timing and nothing more than happenstance. The suggestion that an equally applicable punishment is rendered unconstitutional by virtue of the fact that few choose to commit the crime underlying it, or that only one of many who commit such crime is the one caught and convicted, does not fall within the bounds of any reasonable constitutional discourse.

In conclusion, defendant's punishment in this case "is severe but is not cruel or unusual in the constitutional sense." *Fulcher*, 294 N.C. at 525, 243 S.E.2d at 352. Accordingly, this assignment of error is overruled.

We conclude that defendant's transfer, trial and sentence were constitutional and free of error. Accordingly, the decision of the Court of Appeals is affirmed.

STATE v. GREEN

[348 N.C. 588 (1998)]

AFFIRMED.

Justice FRYE concurring in part and dissenting in part.

In this case, the majority decides two issues. I agree with its decision on the first issue, that the procedures by which juvenile court judges transfer cases to superior court are adequately protective of the due process rights of juveniles. I disagree with the majority's conclusion that the sentencing of this thirteen-year-old juvenile, after such transfer and conviction, to a mandatory term of life imprisonment for first-degree sexual offense does not constitute cruel or unusual punishment under the North Carolina Constitution. Accordingly, I must dissent as to that portion of the opinion.

This case presents a singular situation arising because of the interaction of two separate enactments of the General Assembly, which resulted in a thirteen-year-old, borderline mentally retarded juvenile with no prior criminal record being tried as an adult and subjected to a *mandatory* sentence of life imprisonment for the crime of first-degree sexual offense[2]. In this state, prior to 1 May 1994, neither defendant nor any other thirteen-year-old was subject to a mandatory life sentence for the crime of first-degree sexual offense. After 1 October 1994, and continuing to the present time, no defendant, adult or juvenile, is subject to a mandatory life sentence for that crime. Therefore, a mandatory life sentence was possible for a thirteen-year-old juvenile in North Carolina only during a five-month period.

The majority cites some eighteen jurisdictions which allow the transfer of thirteen-year-old offenders to adult court, and it further notes that a growing minority of states permit a sentence of life imprisonment for sexual offense. However, defendant cites thirty-one jurisdictions where a life sentence is not available for sexual offense, noting that only two states, Arizona and Iowa, have mandatory life sentences for sexual offense, and that in Iowa, thirteen-year-olds are not eligible for trial as adults. Thus, it appears that Arizona is the only state in the nation today where a thirteen-year-old juvenile, upon conviction for sexual offense, will be subject to a mandatory term of life imprisonment.

---

2. As the majority opinion notes, defendant was also sentenced to six years' imprisonment for attempted first-degree rape and fifteen years' imprisonment for first-degree burglary. He thus should remain incarcerated for a considerable period of time even if his mandatory life sentence for first-degree sexual offense is stricken as unconstitutional for the reasons set forth herein.

I believe the narrow legal question presented by this case is whether defendant's mandatory life sentence under these circumstances constitutes cruel or unusual punishment under Article I, Section 27 of the North Carolina Constitution.

This Court has said, "[i]t is within the province of the General Assembly of North Carolina and not the judiciary to determine the extent of punishment which may be imposed on those convicted of crime." *State v. Cradle*, 281 N.C. 198, 209, 188 S.E.2d 296, 303, *cert. denied*, 409 U.S. 1047, 34 L. Ed. 2d 499 (1972). This reliance on legislative judgment assumes that the General Assembly acted intentionally and with full knowledge of the effect of its enactments. Thus, great deference is due decisions of that branch of government as the representative of the people. Occasionally, however, cases come before this Court which raise the question of whether the General Assembly envisioned the potential result of the interrelation of its various legislative enactments, including sentencing statutes.

During the 1994 Special Session, the General Assembly changed the method of punishment for crime in North Carolina by repealing the Fair Sentencing Act and adopting structured sentencing. As a part of those statutory changes, the General Assembly eliminated mandatory sentences for all crimes except first-degree murder. At that same session, the General Assembly also reduced the age at which a juvenile could be tried as an adult, from fourteen to thirteen years of age. While the effective dates of the two enactments were different, it is at least doubtful that the legislature considered, or was aware, that it was creating a five-month period during which thirteen-year-old juveniles would be subject to a mandatory life sentence for offenses other than murder.

The majority correctly points out that this Court has held that a mandatory life sentence for first-degree sexual offense does not constitute cruel or unusual punishment. Suffice it to say that none of those cases involved a thirteen-year-old juvenile tried as an adult. The majority notes that whether a specific punishment is cruel and unusual is evaluated in the context of society's "evolving standards of decency." *Trop v. Dulles*, 356 U.S. 86, 101, 2 L. Ed. 2d 630, 642 (1958). Assuming that this is also the proper standard under the North Carolina Constitution, the General Assembly's repeal of mandatory life imprisonment for first-degree sexual offense must be considered "reliable[,] objective evidence of contemporary values." *Penry v. Lynaugh*, 492 U.S. 302, 331, 106 L. Ed. 2d 256, 286 (1989). By elimi-

STATE v. GREEN

[348 N.C. 588 (1998)]

nating the mandatory life sentence for *all* defendants convicted of this crime, the legislature cannot realistically be deemed to have specifically intended that thirteen-year-old juveniles be suddenly subject to mandatory life terms during the five-month period of 1 May to 1 October 1994.

Defendant, Andre Demetrius Green, a thirteen-year-old, borderline mentally retarded juvenile, was charged with the crime of first-degree sexual offense in August 1994 and was transferred to superior court for trial as an adult. Upon the jury verdict of guilty of first-degree sexual offense, the trial judge had no discretion but to sentence defendant to the mandatory term of life imprisonment. The judge could not consider or weigh any mitigating factors in determining whether a sentence less than life imprisonment was the appropriate penalty. Nor could the judge, in determining a proper sentence, consider defendant's age or prior record level as he could have if the Structured Sentencing Act had been in effect. Defendant's mandatory life sentence was both excessive and unique in its severity. His punishment was, and is, an anomaly in contemporary North Carolina case law, inconsistent with this State's own evolving standards of decency as evidenced by the replacement of mandatory sentencing with the Structured Sentencing Act.

While this Court has often used the same analysis for the state and federal constitutions in terms of whether the prescribed punishment is cruel *and* unusual, the North Carolina Constitution since 1868 has prohibited punishments that are cruel *or* unusual. Clearly, defendant's punishment, under the state of the law as it existed at the time of his commission of the offense, was unusual within the meaning of Article I, Section 27 of the North Carolina Constitution. Therefore, as to the portion of the majority opinion which holds otherwise, I respectfully dissent.

Justice WHICHARD and Justice PARKER join in this concurring and dissenting opinion.